UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:13-CV-958-CHL

**UNITED STATES OF AMERICA, et al.,**　　　　　　　　　　　　　　　**Plaintiffs,**

**v.**

**FORREST B. WHITE, JR. MASONRY, INC, et al.,**　　　　　　　　　　**Defendants.**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

A Miller Act lawsuit "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." 40 U.S.C. § 3133(b)(4); *see also United States ex rel. Interstate Mech. Contractors, Inc. v. Int'l Fid. Ins. Co.*, 200 F.3d 456, 459 (6th Cir. 2000). The central issue before the Court is whether the Miller Act claim of materials supplier/Plaintiff Lee Masonry Products, Inc. ("Lee Brick") against general contractor/Defendant ACC Construction Co., Inc. ("ACC") and surety/Defendant Liberty Mutual Insurance Company ("Liberty Mutual") for materials supplied to subcontractor/Defendant Forrest B. White, Jr. Masonry, Inc. ("White Masonry") was brought within that one-year statute of limitations.

This matter came before the Court for a bench trial on June 11, 2019. (DNs 108, 109.) The Parties consented to the undersigned conducting all proceedings and ordering the entry of a final judgment in the case pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (DNs 51, 52.) Lee Brick, ACC, and Liberty Mutual filed both proposed pretrial and amended post-trial findings of fact and conclusions of law. (DNs 105, 106, 114, 115.) White Masonry did not file proposed findings of fact and conclusions of law, did not attend the trial of this matter, and did not present any evidence in its defense at trial. Indeed, counsel for White Masonry requested permission to

be excused from participation at trial at the pretrial conference, and White Masonry dismissed its counterclaim against Lee Brick prior to trial. (DNs 97, 104.)

After considering the evidence presented at trial and the amended, post-trial findings of fact and conclusions of law submitted by the Parties, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**I.   FINDINGS OF FACT**

On June 20, 2011, the United States via the U.S. Army Corps of Engineers (the "Corps") awarded ACC a contract to construct a military operations in urban terrain ("MOUT") training facility at the Fort Knox Army post, in Fort Knox, Kentucky (the "MOUT Zussman Project"). (Solicitation, Offer, & Award, Pl.'s Tr. Ex. 1;[1] DN 109, at PageID # 779-80.[2]) The project included a mock hotel, municipal building, and several residences for a total of approximately ten buildings, some of which were remodeled and some of which were built from scratch. (DN 109, at PageID # 779-80.) As a condition of the contract, ACC, as principal, and Liberty Mutual, as surety, executed a payment bond in the amount of approximately $9.8 million. (Solicitation, Offer, & Award, Pl.'s Tr. Ex. 1.) On July 27, 2011, ACC subcontracted with White Masonry to perform masonry work for the MOUT Zussman Project for approximately $1.4 million, though the total amount was later amended by a series of change orders. (Subcontract & Change Order Nos. 1-5, Pl.'s Tr. Ex. 8; DN 109, at PageID # 780-81.) White Masonry, in turn, obtained the materials to

---

[1] The Parties submitted numerous exhibits at trial. (DN 111.) As the exhibits often lack internal pagination and include multiple documents as a single exhibit, the Court will refer to each exhibit by the title of the document being referenced, then the exhibit number as either "Pl.'s Tr. Ex." or "Defs.' Tr. Ex." Where necessary for clarity, the Court will include a date in the document's title and/or, where available, a page, section, or paragraph number. Where the number at the end of a citation is not preceded by a section or paragraph symbol, it references a page number or series of page numbers.

[2] The Court will refer to the trial transcript by reference to the PageID # placed into the header by the Clerk at the time of filing, not the internal pagination of the transcript itself.

do its work from Lee Brick. (DN 109, at PageID # 755-58; Discovery Responses, Pl.'s Tr. Ex. 6, at 10; White Deposition, Pl.'s Tr. Ex. 7, at 8-9.)

Under the terms of White Masonry's subcontract with ACC, White Masonry was responsible for performing "[m]asonry," including "all labor, material, equipment for masonry, masonry reinforcing grout, mortar, and all related masonry accessories." (Subcontract, Pl.'s Tr. Ex. 8, at ¶ A-1.) White Masonry later agreed to perform several additional items pursuant to a series of change orders to its subcontract with ACC, including "grout for hollow core," "[a]dditional work at misc building," "[p]umping tops for Hoosier," and additional scaffolding. (Change Order Nos. 2-4, Pl.'s Tr. Ex. 8.) The subcontract did not provide a specific date on which White Masonry was to complete its work other than to state that White Masonry should "prosecute the Work at whatever rate of progress and in whatever sequence as [ACC] may direct." (Subcontract, Pl.'s Tr. Ex. 8, at ¶ A-3.) The subcontract also incorporated ACC's contract with the United States and stated that White Masonry was "bound to [ACC] by the same terms and conditions by which [ACC] [was] bound to the [United States]." (*Id.* at 1; DN 109, at PageID # 806.) The original contract called for all work to be completed within 480 days after receiving the notice to proceed. (Solicitation, Offer, & Award, Pl.'s Tr. Ex. 1, at ¶ 11.) No party presented evidence at trial regarding the date of the notice to proceed. However, in a performance evaluation by the Corps of ACC's work on the MOUT Zussman Project, the original contract completion date was listed as October 28, 2012, and the revised contract completion date was listed as November 30, 2012. (Apr. 29, 2014, Performance Evaluation, Pl.'s Tr. Ex. 14, at § 10(b)-(c); Apr. 29, 2014, Performance Evaluation, Defs.' Tr. Ex. 6, at § 10(b)-(c).)

As will be discussed in further detail below, what work White Masonry performed on the MOUT Zussman Project and when—and in particular what work White Masonry performed after

October 10, 2012—was a central issue at trial. However, neither Lee Brick, ACC, nor Liberty Mutual called a representative of White Masonry as a witness. Accordingly, the following account of White Masonry's activities is based upon the documents submitted by the Parties and the testimony of ACC's onsite project manager.[3]

White Masonry began its work on the MOUT Zussman Project in November 2011. (White Masonry Payment Application No. 1, Pl.'s Tr. Ex. 9.) By mid-September 2012, White Masonry was "pretty well done" with the last of its work under its original contract with ACC. (DN 109, at PageID # 853.) White Masonry had consistently ordered materials from Lee Brick between May and August 2012 but ordered no materials in September 2012.[4] (May 18, 2012 – Oct. 4, 2012 Invoices, Pl.'s Tr. Ex. 3.) Despite ordering no additional materials, White Masonry continued to work on the MOUT Zussman Project in September. According to the Contractors Quality Control Report Daily Log of Construction ("Daily Log(s)") submitted by ACC to the Corps, White Masonry did perform work at the site on approximately eleven days in the month of September but was prevented from doing so several other days due to weather conditions and use of the site for Army training.[5] (Daily Logs July 26, 2012 – Sept. 17, 2012, Defs.' Tr. Ex. 13; Daily Log Sept. 18, 2012, Defs.' Tr. Ex. 12; Daily Logs Sept. 19, 2012 – Sept. 30, 2012, Defs.' Tr. Ex. 14.)

---

[3] Lee Brick did submit an excerpt of the deposition of Forrest B. White, Jr. ("White"), the owner of White Masonry, as an exhibit but the submitted testimony did not discuss what activities White Masonry performed at the MOUT Zussman Project and/or when White Masonry performed those activities. (DN 109, at PageID # 757; White Deposition, Pl.'s Tr. Ex. 7.)

[4] White Masonry ordered a total of $18,880.66 of materials between May 18, 2012, and May 31, 2012. (May 18-31, 2012 Invoices, Pl.'s Tr. Ex. 3.) White Masonry ordered $31,814.51 of materials in June, $33,822.13 of materials in July, and $21,187.33 of materials in August. (June 4, 2012 – Aug. 30, 2012 Invoices, Pl.'s Tr. Ex. 3.)

[5] ACC Vice President, Matt McKnight ("McKnight"), who was also ACC's Project Manager on the MOUT Zussman Project, testified that the Daily Logs were documents prepared daily for the Corps by ACC. (DN 109, at PageID # 796-97.) To the extent the Daily Log contained information about what a particular subcontractor did that day, the information came from a report prepared daily by that subcontractor or conveyed verbally to ACC personnel. (*Id.* at 797.)

White Masonry also continued to work on the MOUT Zussman Project in October 2012. According to the Daily Logs for October 1-11, 2012, White Masonry performed the following work on the MOUT Zussman Project during that period:

- "[l]aid 4 beam pockets at AAR" on October 2, 2012;
- "[l]aid 4 beam pockets at HO" on October 2, 2012;
- "[f]illed in beam pockets on HO" on October 3, 2012;
- "[p]umped grout on remainder of retaining wall at HO" on October 3, 2012;
- "[p]umped grout on gable at MU" on October 3, 2012;
- "[s]tocked block and prepped knee walls at 3rd floor MU" on October 3, 2012;
- "[f]inished beam pockets in HO" on October 4, 2012;
- "[l]aid four knee walls in MU at 2nd and 3rd floor" on October 4, 2012;
- "[g]routed beam pockets in 2S4" on October 4, 2012;
- "[l]aid parafin [sic][6] wall on elevator shaft at MU" on October 5, 2012;
- "[l]aid parafin [sic] wall on front stoop MU" on October 5, 2012;
- "[r]eset scaffold on 2S2" on October 5, 2012;
- "[r]ubbed and pointed up retaining wall front HO" on October 5, 2012;
- "[l]aid block on parafin [sic] wall at 2S2" on October 8, 2012;
- "[l]aid block on 2S2 on inside wall[,] set precast on walls" on October 9, 2012;
- "[l]aid block on 2S2 on parapet walls" on October 10, 2012;
- "finished walls" on October 10, 2012;
- "[s]tarted laying block on block on steps at MU" on October 10, 2012;
- "[p]oint rubbed on 2S2 on outside of building" on October 11, 2012; and
- "[c]lean-up around 2S2 outside" on October 11, 2012.

(Daily Logs for Oct. 2-4, 2012, Defs.' Tr. Ex. 14; Daily Log for Oct. 5, 2012, Defs.' Tr. Ex. 15; Daily Log for Oct. 6, 2012, Defs.' Tr. Ex. 16; Daily Log for Oct. 7, 2012, Defs.' Tr. Ex. 17; Daily Log for Oct. 8, 2012, Defs.' Tr. Ex. 18; Daily Log for Oct. 9, 2012, Defs.' Tr. Ex. 19; Daily Log for Oct. 10, 2012, Defs.' Tr. Ex. 20; Daily Log for Oct. 11, 2012, Defs.' Tr. Ex. 21; Daily Logs for Oct. 1-11, 2012, Pl.'s Tr. Ex. 12; DN 109, at PageID # 796-802.) AAR, HO, MU, 2S4, and 2S2 are particular buildings that were part of the MOUT Zussman Project. (Punch List, Pl.'s Tr.

---

[6] McKnight testified that as to the October 8, 2012, Daily Log, when White Masonry said "parafin" wall, he believed they meant parapet wall. (DN 109, at PageID # 801.) However, he did not correct the use of the term as to other Daily Logs. Given the type of work at issue, the Court concludes that each use of "parafin" was a typographical error.

5

Ex. 10 (listing AAR, HO, MU, 2S4, and 2S2 in the first column from the left under the heading "BLDG"); Punch List, Defs.' Tr. Ex. 22 (same).)

According to the punch list first created by ACC in August 2012 and updated periodically thereafter, White Masonry also did the following work on the MOUT Zussman Project in October 2012:

- "[laid] CMU at upper knee wall" at MU on October 4, 2012;
- "[c]lean[ed] CMU outside" at MU on October 11, 2012;
- "[p]atch[ed] hole in CMU wall in basement" at 1S2 on October 24, 2012;
- "[p]atch[ed] CMU at beam at front porch" at 1S1 on October 25, 2012;
- "[p]atch[ed] CMU by entrance beam" at 1S3 on October 25, 2012;
- "[p]atch[ed] CMU next to entrance beam" at 1S4 on October 25, 2012;
- "[p]atch[ed] CMU in basement corner room" at 1S5 on October 25, 2012;
- "[laid] CMU at ends of entrance beams" at 1S6 on October 25, 2012;
- "[p]oint[ed] up CMU around beams" at 2S4 on October 30, 2012;
- "[p]ut CMU at stairway at beam" at MU on October 30, 2012; and
- "[laid] CMU at planters" at MU at October 31, 2012.

(Punch List, Pl.'s Tr. Ex. 10; Punch List, Defs.' Tr. Ex. 22.)[7]  Again, MU, 1S2, 1S1, 1S3, 1S4, 1S5, 1S6, and 2S4 are particular buildings that were part of the MOUT Zussman Project.  (Punch List, Pl.'s Tr. Ex. 10 (listing MU, 1S2, 1S1, 1S3, 1S4, 1S5, 1S6, and 2S4 in the first column from the left under the heading "BLDG"); Punch List, Defs.' Tr. Ex. 22 (same).)  The punch list also reflected some items that White Masonry completed in September and November 2012 and some items it did not complete at all.  (*Id.*)

White Masonry ordered two invoices of materials in October 2012 totaling only $1.983.26 and returned $1,883.57 of materials according to a third invoice.  (Oct. 4-10, 2012 Invoices, Pl.'s Tr. Ex. 3.)  The last invoice for materials Lee Brick provided to White Masonry is dated October

---

[7] The two versions of the undated punch list submitted by Lee Brick, ACC, and Liberty Mutual were identical with respect to the work of White Masonry in October 2012 except that ACC and Liberty Mutual's version indicated that White Masonry had not completed the item "[p]ut CMU at stairway at beam" at MU.  Lee Brick's version indicated the same was completed on October 30, 2012. *Compare* Punch List, Defs.' Tr. Ex. 22, *with*, Punch List, Pl.'s Tr. Ex. 10.

10, 2012, for $510.60 worth of merchandise. (*Id.*; Oct. 10, 2012 Invoice, Defs.' Tr. Ex. 1.) On that date, White Masonry picked up 180 q-lite concrete masonry units ("CMUs"), two palettes, eighty "2 1/4" Solid NW," and 500 "wire 8" ladur hot-dip." (*Id.*; DN 109, at PageID # 754.) No party offered direct testimony regarding for what those materials were used.

White Masonry submitted its last payment application to ACC on October 1, 2012, which reflected that White Masonry had completed $1,506,703.50 of $1,516,703.50 in total work up to that point. (Payment Application No. 11, Defs.' Tr. Ex. 4; Payment Application No. 11, Pl.'s Tr. Ex. 9; DN 109, at PageID # 785-86.) White Masonry then requested payment of an additional $42,652.00 via e-mail on November 14, 2012. (E-mail from McKnight, Defs.' Tr. Ex. 5; E-mail from McKnight, Pl.'s Tr. Ex. 9.) ACC issued a final payment in the amount of $42,652.90 on November 14, 2012. (Payment Ledger, Pl.'s Tr. Ex. 9; Payment Ledger, Defs.' Tr. Ex. 2; DN 109, at PageID # 787.) McKnight testified that the work reflected in the e-mail was not related to the underlying masonry work that ACC subcontracted White Masonry to do and also called the work "change order work." (DN 109, at PageID # 786-87.) The e-mail listed $9,125.00 for scaffolding, $11,208.00 of "extra work from pr#10," and $3,600.00 "from pumping tops for hoosier," in addition to retainage.[8] (E-mail from McKnight, Defs.' Tr. Ex. 5; E-mail from McKnight, Pl.'s Tr. Ex. 9.) However, this work overlaps in terms of label and amount with Change Order Nos. 3 and 4. (Change Order Nos. 3-4, Pl.'s Tr. Ex. 8.)

White Masonry paid Lee Brick regularly for the materials it obtained until approximately July 2012 when it stopped paying but continued to order materials. (DN 109, at PageID # 744; Aged Trial Balance, Pl.'s Tr. Ex. 3.) When Allen White of White Masonry called Lee Brick salesman Donald Ulrich ("Ulrich") for additional materials in October 2012, Ulrich informed him

---

[8] McKnight testified that "retainage" was money for work previously completed that ACC maintained to use to secure the ability to force subcontractors to do punch work or correct deficient work. (DN 109, at PageID # 786.)

7

that Lee Brick couldn't ship anymore materials until some payment was made. (DN 109, at PageID # 755, 758.)  Ulrich ultimately obtained permission from Barry Lee ("Lee"), the Secretary/Treasurer of Lee Brick's Board of Directors and a manager of the company, to allow White Masonry to have the last load of materials to finish work and get paid. (*Id.* at 743, 758.)

In total, White Masonry failed to pay Lee Brick $105,804.32 for materials requested for the MOUT Zussman Project that were invoiced between May 18, 2012, and October 10, 2012. (Proof of Claim, Pl.'s Tr. Ex. 3; DN 109, at PageID # 747-48; Discovery Responses, Pl.'s Tr. Ex. 6, at 10-11.) White, the owner of White Masonry, admitted receiving materials from Lee Brick during that period, receiving copies of the invoices for those materials, and that the total amount of those invoices was $105,804.32. (DN 109, at PageID # 757; Discovery Responses, Pl.'s Tr. Ex. 6, at 10-11; White Deposition, Pl.'s Tr. Ex. 7, at 8-9.) While no witness offered affirmative testimony at trial that the materials ordered by White Masonry and supplied by Lee Brick were ever delivered to the MOUT Zussman Project, Ulrich testified that White Masonry set up a job specific account for the MOUT Zussman Project. (DN 109, at PageID # 772-73.) All fifty-two invoices comprising the total amount of $105,804.32 discussed above were labeled "ship to" "Forrest B White/Mt. Zussman, Fort Knox, KY." (May 18, 2012 – Oct. 10, 2012 Invoices, Pl.'s Tr. Ex. 3.)

When White Masonry failed to pay, Lee Brick contacted ACC. Specifically, on September 17, 2012, Ulrich faxed ACC representatives copies of the invoices that were unpaid by White Masonry. (Letter and Fax, Pl.'s Tr. Ex. 5, at 2; DN 109, at PageID # 745, 759-62.) ACC's Project Manager for the MOUT Zussman Project subsequently sent a letter to White Masonry requesting that White Masonry remit payment to Lee Brick. (Letter and Fax, Pl.'s Tr. Ex. 5; DN 109, at PageID # 779.) When White Masonry still failed to pay, on December 1, 2012, Lee Brick's

counsel provided written notice to ACC of its claim under the Miller Act for amounts unpaid by White Masonry totaling $108,304.32. (DN 1-3.) Then, on December 21, 2012, Lee Brick's counsel provided written notice to Liberty Mutual of its claim under the Miller Act. (December 21, 2012 Notice of Miller Act Claim, Pl.'s Tr. Ex. 2.) On February 26, 2013, White Masonry submitted a verified proof of claim to Liberty Mutual amending its claim amount to $105,804.32, and enclosing the relevant invoices and work orders in support of its demand for payment.[9] (Proof of Claim, Pl.'s Tr. Ex. 3.) The February 26, 2013, proof of claim was also sent to ACC. (*Id.*) When it again did not receive payment, Lee Brick filed the instant action on October 7, 2013. (DN 1.)

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

The Court has jurisdiction over Lee Brick's Miller Act Claim against ACC and Liberty Mutual pursuant to 28 U.S.C. § 1331 because the same arises under a federal statute, the Miller Act. 28 U.S.C. § 1331 (2018). The Court exercises supplemental jurisdiction over Lee Brick's open account claim against White Masonry pursuant to 28 U.S.C. § 1367 because the two claims derive from a common nucleus of operative fact. 28 U.S.C. § 1367 (2018) (stating that where the court has original jurisdiction over a claim, the court shall have supplemental jurisdiction over all other claims that "form part of the same case or controversy"); *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 209 (6th Cir. 2004) (quoting *Ahearn v. Charter Twp. of Bloomfield*, 100 F.3d 451,

---

[9] At trial, Lee testified that the amount was reduced from $108,304.32 in its initial notices of Miller Act claim to $105,804.32 in its proof of claim because of a payment by White Masonry. (DN 109, at PageID # 748-49.) Lee Brick introduced the check from White Masonry as an exhibit. (Check, Pl.'s Tr. Ex. 4.) The check, dated January 15, 2012, was in the amount of $5,000.00 and listed in the memo line "2500.00/SOFLAN 2500.00/Zussman." (*Id.*) While Lee testified that the payment in the check was the reason for the $2,500 reduction in Lee Brick's demand, he offered no explanation for why the same was applied between the December 1, 2012, and December 21, 2012, notice letters and Lee Brick's February 26, 2013, proof of claim when the check was dated January 15, 2012. Because White Masonry admitted to receiving materials and invoices in the amount of $105,804.32, the Court need not inquire further into the discrepancy.

9

454-55 (6th Cir.1996)) ("Claims form part of the same case or controversy when they 'derive from a common nucleus of operative facts.' ").

### B. Count I: Open Account Claim Against White Masonry

Lee Brick demonstrated by a preponderance of the evidence that White Masonry obtained materials from Lee Brick over a period of months, that White Masonry was provided with invoices for those materials, and that White Masonry failed to pay the amount due under those invoices totaling $105,804.32. White Masonry's owner admitted as much during his deposition and in his response to requests for admission propounded by Lee Brick. (Discovery Responses, Pl.'s Tr. Ex. 6, at 10-11; White Deposition, Pl.'s Tr. Ex. 7, at 8-9.) As White Masonry did not attend trial or otherwise offer any evidence in its defense and withdrew its counterclaim regarding a set-off defense, the Court finds that Lee Brick is entitled to judgment against White Masonry in the amount of $105,804.32.

As to prejudgment interest, a federal court looks to state law to determine the propriety of an award of prejudgment interest where the claim for which the interest is awarded is before it on supplemental jurisdiction. *Mills v. River Terminal Ry. Co.*, 276 F.3d 222, 228 (6th Cir. 2002). Under Kentucky law, "prejudgment interest is awarded as a matter of right on a liquidated demand . . . ." *3D Enters. Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005). Damages are liquidated if they are "of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." *Id.* (quoting 22 Am. Jur. 2d Damages § 469 (2004)); *Ford Contracting, Inc. v. Ky. Transp. Cabinet*, 429 S.W.3d 397, 414 (Ky. Ct. App. 2014) (quoting *3d Enters.*, 174 S.W.3d at 450). Here, White Masonry and Lee Brick agree as to

the amount owed on White Masonry's account with Lee Brick, and the same is calculable by adding up the amount of the outstanding invoices. Therefore, Lee Brick's damages are liquidated, and Lee Brick is entitled to prejudgment interested on the same. In its post-trial findings of fact and its Complaint, Lee Brick requested prejudgment interest from December 1, 2012, until the date of judgment. (DN 115, at PageID # 901; DN 1, at PageID # 6.) While arguably, as to White Masonry, Lee Brick would have been entitled to prejudgment interest from the date each invoice came due, the Court will not grant Lee Brick greater relief than requested. Accordingly, the Court will award prejudgment interest from December 1, 2012, through the date of judgment.

   **C.  Count II: Miller Act Claim Against ACC and Liberty Mutual**

  Under the Miller Act, 40 U.S.C. §§ 3131-3134, before the federal government awards a contract over $100,000 to a general contractor, the general contractor must post a performance bond and a payment bond. 40 U.S.C. § 3131(b) (2018). The payment bond must protect "all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person." *Id.* § 3131(b)(2). A person who has a "direct contractual relationship with a subcontractor" may file suit on the payment bond if that person has not been paid in full within ninety days of supplying the material for the contract. 40 U.S.C. § 3133(b)(2) (2018). The Court construes the Miller Act's protections liberally to effectuate its remedial purpose. *Illinois Sur. Co. v. John Davis Co.*, 244 U.S. 376, 380 (1917). The plaintiff may "recover from the principal or surety, or both, for work and material supplied." *U.S. ex rel. Statham Instruments, Inc. v. W. Cas. & Sur. Co.*, 359 F.2d 521, 524 (6th Cir. 1966).

  A Miller Act lawsuit "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." 40 U.S.C. § 3133(b)(4); *see also Int'l Fid.*, 200 F.3d at 459. The phrase "the last of the labor was

11

performed or material was supplied" means "more than mere substantial completion or substantial performance of the plaintiff's obligations under its contract." *Int'l Fid.*, 200 F.3d at 459. The Court asks whether the work performed was pursuant to the original contract or whether it was performed as a correction or repair. *Id.* at 460. Work performed as a correction or repair or materials supplied for that work do not toll the Miller Act's statute of limitations. *Id.* at 461.

ACC and Liberty Mutual argued that Lee Brick's claims are barred by the Miller Act's statute of limitations. (DN 114, at PageID # 887.) The Parties disagree about who carries the burden of proof on this issue. As at least one district court to have addressed this issue noted, "[w]hat scant case law exists is divided on whether plaintiff or defendant has the burden to prove that the plaintiff's suit was filed within [the] Miller Act's one-year statute of limitations." *U.S. ex rel. Apex Enters., Inc. v. Berkley Reg'l Ins. Co.*, No. 1:13-CV-0209-EJL, 2015 WL 12839501, at *9 (D. Idaho Feb. 9, 2015). Lee Brick argued that the statute of limitations is an affirmative defense for which ACC and Liberty Mutual carry the burden of proof. (DN 115, at PageID # 898.) Lee Brick cited in support to *Martin v. Weaver*, 666 F.2d 1013, 1019 (6th Cir. 1981), and *Deere & Company v. FIMCO, Inc.*, 302 F.Supp.3d 837, 849 (W.D. Ky, 2017). However, neither are Miller Act cases. By contrast, ACC and Liberty Mutual argued that Lee Brick retains the burden of proving that it supplied materials within the time frame supplied by the Miller Act. (DN 114, at PageID # 889-90.) ACC and Liberty Mutual cited in support to *U.S. ex rel. Dover Elevator Co. v. General Ins. Co. of America*, 339 F.2d 194, 195 (6th Cir. 1964). In *Dover Elevator*, the Sixth Circuit explained that "[t]he limitation provided in the [Miller] Act was not to be treated as an ordinary statute of limitation. The [Miller] Act created a new right and prescribed the remedy therefor. The filing of suit within the limitation period was a condition precedent to the exercise of the right." *Id.* This language suggests that it is Lee Brick, not ACC and Liberty Mutual who

12

bears the burden of proof on this issue. While in its prior opinion on the Parties' cross-motions for summary judgment, this Court concurred with Lee Brick and put the burden on Defendants (DN 71, at PageID # 622-23), the Court cannot now ignore the binding, published Sixth Circuit precedent cited to by ACC and Liberty Mutual. Therefore, the Court concludes that it is Lee Brick's burden of proof to demonstrate that it brought suit within the relevant time period.[10]

Though not raised directly by the Parties, mindful of its independent obligation to ensure that it has subject matter jurisdiction over all cases it adjudicates, the Court must examine whether *Dover Elevator's* language deprives the Court of subject matter jurisdiction over a plaintiff's claim where the statute of limitations is not met. While the Sixth Circuit in *Dover Elevator* stated that filing suit with the limitation period was a "condition precedent," it did not say expressly, as other courts have done, that the limitations period is jurisdictional, nor is it clear that the two are one in the same. *See Highland Renovation Corp. v. Hanover Ins. Grp.*, 620 F. Supp. 2d 79, 81 (D.C. Cir. 2009) (noting that "other courts have ruled that the Miller Act's one-year limitations period is not accurately described as jurisdictional, but instead is a condition precedent to bringing an action under the Miller Act that a plaintiff must satisfy."). For example, in *U.S. ex rel. Celanese Coatings Co. v. Gullard*, 504 F.2d 466, 468 (9th Cir. 1974), which cited in support to *Dover Elevator*, the Ninth Circuit explained that "[a]s an integral part of the statute creating the remedy, the one year limitation in [the Miller Act] is jurisdictional. Compliance with the limitation period is a condition precedent to maintaining an action under that section." However, the Ninth Circuit overruled *Celanese* in *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th

---

[10] As the Court will explain below, the question of who bears the burden of proof is not determinative on the facts of this action as the Court concludes from the facts presented both that Lee Brick failed to prove by a preponderance of the evidence that it brought suit within the limitations period and that ACC and Liberty Mutual proved by a preponderance of the evidence that Lee Brick did not do so, whether or not they were under any affirmative obligation to prove the same.

13

Cir. 2013), relying on the Supreme Court's decisions in *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428,433 (2011), and *Arbaugh v. Y & H Corporation*, 546 U.S. 500, 516 (2006). Based on the Supreme Court's explanation in *Henderson* and *Arbaugh* about the difference between jurisdictional requirements and "claim-processing rules," the Ninth Circuit held that the Miller Act's statute of limitations was a claim processing rule, not a jurisdictional requirement. *Air Control*, 720 F.3d at 1177. Other Circuits have come to the same conclusion. *See, e.g.*, *Arena v. Graybar Elec. Co. Inc.*, 669 F.3d 214, 221 (5th Cir. 2012); *Animal Sci. Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-68 (3d Cir. 2011). Additionally, the Court notes that other district courts within the Sixth Circuit have concluded that the Miller Act's statute of limitations is not jurisdictional, though without any discussion of *Dover Elevator*. *See U.S. ex rel. Auto-Owners Ins. Co. v. Fid. & Deposit Co. of Maryland*, No. 3:15-CV-1423, 2016 WL 7012304, at *4 (N.D. Ohio Dec. 1, 2016); *United States v. Cannon Mgmt. Grp., LLC*, No. 2:12-CV-881, 2013 WL 4499739, at *4 (S.D. Ohio Aug. 21, 2013). Because *Dover Elevator* did not expressly state that the Miller Act's one-year limitations period is jurisdictional, nor does the Sixth Circuit appear to have done so in any other opinion, the Court follows the reasoning of the cases cited above and concludes that the Miller Act's limitations period is not jurisdictional. Therefore, the Court will now proceed to assess whether Lee Brick has proven its claim was timely.

      Lee Brick filed this action on October 7, 2013. (DN 1.) Only two of the invoices attached to Lee Brick's proof of claim and listed in the aged trial balance it attached to its notices of Miller Act claim sent to ACC and Liberty Mutual are within one year of October 7, 2013: an October 10, 2012, invoice in the amount of $510.60, and an October 8, 2012, invoice crediting $1883.57 to White Masonry. (DN 1-3; Dec. 21, 2012, Notice of Miller Act Claim, Pl.'s Tr. Ex. 2; Oct. 8 & 10, 2012, Invoices, Pl.'s Tr. Ex. 3.) The October 8, 2012, invoice constituted a credit for returned

merchandise, and the "Customer Pick Up Request & Returns for Credit" form matching the items on the October 8, 2012, invoice was also attached to Lee Brick's proof of claim.  (Oct. 8, 2012 Invoice & Returns for Credit Form, Pl.'s Tr. Ex. 3.)  Therefore, the sole question for the Court's determination is whether the materials supplied in the October 10, 2012, invoice were supplied for White Masonry to perform a correction or repair or whether the materials were supplied to complete work pursuant to the original contract.

The Court finds that the evidence of record shows that in October 2012, White Masonry was performing both work pursuant to its original contract with ACC and corrective or repair work for the MOUT Zussman Project.  McKnight testified that by October 2012, the MOUT Zussman Project was close to being finished and that it was "mainly punch or deficient work being corrected."  (DN 109, at PageID # 787.)  As noted above, the Miller Act's statute of limitations invokes more than mere substantial performance.  *Int'l Fid.*, 200 F.3d at 459.  However, McKnight testified that a number of documents demonstrated that deficient work was being corrected.  Specifically, he stated that the punch list first-prepared by ACC, and updated periodically thereafter, listed relatively minor items to be fixed and that the list of Deficiency Items by QA ("QA Deficiency Log") maintained and prepared by the Corps reflected more significant items.  (DN 109, at PageID # 802-804.)

McKnight testified that QA Nos. 15, 21, 22, 23, 24, 26, and 29 on the QA Deficiency Log related to White Masonry's work.  (*Id.* at 789.)  QA No. 15 was for some damaged CMU at 2S2 that the Corps first identified in July 26, 2012.  (QA Deficiency Log, Defs.' Tr. Ex. 6, at 2; QA Deficiency Log, Pl.'s Tr. Ex. 14, at 2; DN 109, at PageID # 789.)  The Daily Logs reflect that White Masonry was working at 2S2 on October 5, 9, 10, and 11, 2012.  (Daily Log for Oct. 5, 2012, Defs.' Tr. Ex. 15; Daily Log for Oct. 9, 2012, Defs.' Tr. Ex. 19; Daily Log for Oct. 10, 2012,

15

Defs.' Tr. Ex. 20; Daily Log for Oct. 11, 2012, Defs.' Tr. Ex. 21; Daily Logs for Oct. 1-11, 2012, Pl.'s Tr. Ex. 12; DN 109, at PageID # 796-802.) McKnight testified that the October 9, 2012 Daily Log entry that White Masonry "[l]aid block on 2S2 inside wall[,] set precast on walls" related to QA No. 15 and reflected White Masonry fixing deficient work. (DN 109, at PageID # 802; Daily Log for Oct. 9, 2012, Defs.' Tr. Ex. 19; Daily Log for Oct. 9, 2012, Pl.'s Tr. Ex. 12.) QA Nos. 21, 26, and 29 related to problems at several buildings. (DN 109, at PageID # 790; QA Deficiency Log, Defs.' Tr. Ex. 6, at 2; QA Deficiency Log, Pl.'s Tr. Ex. 14, at 2.) According to the minutes of the weekly meetings between the Corps and ACC between September 24, 2012, and November 6, 2012, despite being first set to correct these items in late September or early October, work on them was still ongoing as of the November 6, 2012, meeting. (Sept. 24, 2012, Meeting Minutes, Defs.' Tr. Ex. 7, at 2; Oct. 2, 2012, Meeting Minutes, Defs.' Tr. Ex. 8, at 1; Oct. 9, 2012, Meeting Minutes, Defs.' Tr. Ex. 9, at 1; Oct. 16, 2012, Meeting Minutes, Defs.' Tr. Ex. 10, at 1; Oct. 23, 2012, Meeting Minutes, Defs.' Tr. Ex. 11, at 1; Nov. 6, 2012, Meeting Minutes, Pl.'s Tr. Ex. 13, at 1.) QA No. 22 related to a CMU counter White Masonry failed to install in the Hotel. (QA Deficiency Log, Defs.' Tr. Ex. 6, at 2; QA Deficiency Log, Pl.'s Tr. Ex. 14, at 2; DN 109, at PageID # 790.) The Daily Logs reflect that White Masonry was working on the hotel on October 2-4, 2012. (Daily Log for Oct. 2-4, 2012, Defs.' Tr. Ex. 14; Daily Logs for Oct. 2-4, 2012, Pl.'s Tr. Ex. 12.) QA No. 23 related to a problem with cracked CMU in the municipal building. (QA Deficiency Log, Defs.' Tr. Ex. 6, at 2; QA Deficiency Log, Pl.'s Tr. Ex. 14, at 2; DN 109, at PageID # 790.) The Daily Logs reflect that White Masonry was working on the municipal building on October 3, 4, 5, and 10, 2012. (Daily Log for Oct. 3-4, 2012, Defs.' Tr. Ex. 14; Daily Log for Oct. 5, 2012, Defs.' Tr. Ex. 15; Daily Log for Oct. 10, 2012, Defs.' Tr. Ex. 20; Daily Logs for Oct.

16

3-5 & 10, 2012, Pl.'s Tr. Ex. 12.) McKnight testified that remedying all of these QA items would require White Masonry to obtain additional materials. (DN 109, at PageID # 791-92.)

Additionally, the punch list first-created by ACC in August 2012, reflected that White Masonry was correcting deficient work through late October 2012. It contains numerous entries indicating the White Masonry "patched" CMU in various locations between October 24-25, 2012. (Punch List, Pl.'s Tr. Ex. 10; Punch List, Defs.' Tr. Ex. 22.) In its post-trial filing, Lee Brick cited to the dissent in *United States ex rel. Interstate Mech. Contractors, Inc. v. Int'l Fid. Ins. Co.*, 200 F.3d 456, 462 (6th Cir. 2000) (Moore, J., dissenting), as being instructive regarding the nature of a punch list. (DN 115, at PageID # 898.) But McKnight's testimony relating the punch list to remedying defects distinguishes it from the type of "to-do list" punch list referenced by Judge Moore. (DN 109, at PageID # 803-04.) Based on the QA Deficiency Log, punch list, relevant Daily Logs, Meeting Minutes, and McKnight's testimony, the Court finds that White Masonry was correcting deficient work and/or performing repair work as described in *United States ex rel. Interstate Mech. Contractors, Inc. v. Int'l Fid. Ins. Co.* in October 2012, including after it received additional materials from Lee Brick on October 10, 2012.

However, other factors also indicate that White Masonry was still performing work pursuant to the original contract after it received the final load of materials from Lee Brick on October 10, 2012. While the original October 28, 2012, contract completion date had expired, the revised November 30, 2012 date had not yet expired. (Apr. 29, 2014 Performance Evaluation, Pl.'s Tr. Ex. 14, at § 10(b)-(c); Apr. 29, 2014 Performance Evaluation, Defs.' Tr. Ex. 6, at § 10(b)-(c).) White Masonry's final payment application reflected money still to be paid for original contract work. (Payment Application No. 11, Defs.' Tr. Ex. 4; Payment Application No .11, Pl.'s Tr. Ex. 9; DN 109, at PageID # 785-86.) Further, White Masonry's final e-mail request for

payment in November 2012 related to work done pursuant to Change Order Nos. 3 and 4. (E-mail from McKnight, Defs.' Tr. Ex. 5; E-mail from McKnight, Pl.'s Tr. Ex. 9; Payment Ledger, Pl.'s Tr. Ex. 9; Payment Ledger , Defs.' Tr. Ex. 2; DN 109, at PageID # 787; Change Order Nos. 3-4, Pl.'s Tr. Ex. 8.) Change Order Nos. 3 and 4, both dated November 14, 2012, reflected that White Masonry was required to complete change order work "subject to the provisions of the above named contract" and that listed work was to be "added" to the contract. (Change Order Nos. 3 & 4, Pl.'s Tr. Ex. 8.) Accordingly, work performed pursuant to these Change Orders was work performed pursuant to the original contract. Based on these facts, the Court also finds that White Masonry was performing work pursuant to its original contract with ACC after it received the last load of materials from Lee Brick on Oct. 10, 2012.

However, the question before the Court is not merely whether White Masonry was performing corrective work or performing work pursuant to the original contract but whether *the materials* supplied by Lee Brick in the October 10, 2012, invoice were used for work pursuant to the original contract or for remedial/corrective work. Though there is no direct testimony in the record on this issue, several factors militate in favor of the conclusion that those materials were obtained to perform remedial or corrective work. The fact that White Masonry ordered no materials whatsoever from Lee Brick in September 2012, despite performing work on the MOUT Zussman Project, and ordered very little materials in October 2012 as compared to May through August 2012 supports an inference that White Masonry ordered additional materials it did not need for the original work. This is reinforced by the October 8, 2012, return of certain materials, as there is no testimony in the record that those materials were incorrectly ordered or otherwise defective. No witness testified that White Masonry would have needed additional materials to complete the Change Order work discussed above or the remainder of its work pursuant to its

18

original contract with ACC. Instead, McKnight explicitly testified that White Masonry would have needed additional materials to correct the deficient items identified on the QA log, and the record reflects that White Masonry performed work on the QA and other punch list items after it received the last load of materials from Lee Brick on October 10, 2012. (DN 109, at PageID # 791-92.) In the absence of direct evidence from White Masonry regarding the purpose of those materials, the Court finds that the circumstantial evidence of record supplied by ACC and Liberty Mutual demonstrates by a preponderance of the evidence that the October 10, 2012, materials were used for corrective or repair work. Accordingly, the Court finds that Lee Brick failed to sustain its burden of proof. Because the materials supplied in the October 10, 2012, invoice were used for corrective or repair work, Lee Brick's claim was not brought within "one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action" as required by the Miller Act and is, therefore, time-barred. 40 U.S.C. § 3133(b)(4); *Int'l Fid.*, 200 F.3d at 459.

## III.  ORDER

Accordingly, and based on the findings of fact and conclusions of law set forth above, IT IS HEREBY ORDERED as follows:

(1)  The Plaintiff, Lee Masonry Products, Inc., has failed to prove by a preponderance of the evidence that its claim was brought within one year after the day on which the last of its materials were supplied as required by the Miller Act.

(2)  Defendants ACC Construction Co., Inc. and Liberty Mutual Insurance Company have proved by a preponderance of the evidence that the Miller Act claim of Plaintiff, Lee Masonry Products, Inc., is barred by the Miller Act's one-year statute of limitations.

(3)     Defendants ACC Construction Co., Inc. and Liberty Mutual Insurance Company are granted judgment in their favor on the Miller Act claim of Plaintiff, Lee Masonry Products, Inc., and the same is hereby dismissed.

(4)     The Plaintiff, Lee Masonry Products, Inc., has proved by a preponderance of the evidence that Defendant, Forrest B. White, Jr. Masonry, Inc., failed to remit payment for materials provided in the amount of $105,804.32.

(5)     The Plaintiff, Lee Masonry Products, Inc., is granted judgment on its claim against Defendant, Forrest B. White, Jr. Masonry, Inc., in the amount of $105,804.32, plus prejudgment interest at the rate of 8% per annum from December 1, 2012, through the date of judgment, and post-judgment interest at the rate prescribed by 28 U.S.C. § 1961 from the date of judgment until paid in full.

(6)     A judgment consistent with this opinion will be entered separately pursuant to Fed. R. Civ. P. 58.

Colin H Lindsay, Magistrate Judge
United States District Court

cc:     Counsel of Record

April 22, 2020